This is Globoforce. I didn't know lawyers still carried around roller brake cases like that. Okay, Mr. Black. May it please the Court, my name is Bert Black and I represent Christopher Ounjian, the Plaintiff Appellant. Mr. Ounjian worked there for more than eight years until he had to resign to avoid participating in a fraudulent business model that required lies about the purchasing power of recognition points awarded to the employees of WorkHuman's client companies and lies about how WorkHuman set prices for items in its online store when those employees redeemed their points. It seems to me that there's nothing that Globoforce required of your client after he objected that was in any respect a change from what he had been doing before. I'm not sure I quite understand the question. Perhaps I should answer it this way. Well, why don't you answer this. Did they require him to do anything other than his pre-existing job responsibilities? He objected for two years internally and there was no requirement that he do anything other than his job responsibilities. That would be the pre-existing job responsibilities. Then, when it became clear to him that there was not going to be any internal reform, he was told... But there's nothing that he's told that he's going to have to do in the future that's any different from what he's ever done before that he could specifically point to as this future act would be illegal. What he was... And therefore, I can't do that. Everything he's objecting to is the continuation of whatever his job responsibilities have been. What he was going to have to do in the future at the time of his resignation in September of 2021 was to revert to his pre-existing responsibilities, which would have meant the period from 2019 through 2020 up until early 2021 until he started objecting. And during that period, he was sending out proposals that included the fraudulent language. He would have had to revert to sending out the proposals with the fraudulent language. What did they ever require him to do that was fraudulent? You're telling me that he actually participated in fraud? And where in the record does it show that he had previously participated in fraud? For two years, he was sending out proposals that included false representations about the purchasing power of points. And he was explicitly told, you tell your prospective clients it's 85 to 95 percent purchasing power, which was not true. But sir, isn't it true though that there was a period of time? One could conclude that your client really did believe that the company was asking him to engage in fraudulent behavior. But there's also a view of the record that that was his interpretation. And at some period, he decided that he was going to provide his clients with accurate information. And once he started doing that, he was not fired. So where in the record is that pressure to revert back to giving what your client believed to be fraudulent information? Let me complete my answer to the other question and then I'll address your question. No, no, no. She's getting to exactly what I want to know. Okay. Then it's the same question. In terms of what he was ordered to do, he was ordered to tell the lie about the 85 percent purchasing power. And he was ordered not to tell prospective clients that when you purchase things from the store, it's on a cost plus basis. But as I understand Judge Abudu's question, Judge Abudu, she points out that he stopped doing what he objected to. And they didn't fire him. Isn't that right? They did fire him outright. But they certainly were disturbing. And it was never something that he was free to do. But he stopped doing it, right? Because he felt that it was fraudulent, right? He didn't exactly stop doing it. He started telling a piece of the truth. I mean, he wants to keep his job. This is a good gig. And he wants the company to reform. What he's after is reform. He doesn't want to just tell the truth about the fraud. He wants the fraud to end. And in the end, the fraud didn't end and he couldn't tell the truth. Why did he know he couldn't tell the truth? Because he'd been told, stop your complaining. He'd been told, this company is never going to approve. But they never actually forced him to do anything he didn't want to do. There's no evidence that I'm aware of in this record that they actually forced him to do something to which he objected. I don't think the question is necessarily force. It's a question of what he knew he would have had. What's easily inferred from the record is that if he had continued with the company, there would have been no choice but to revert to the preexisting use. But there's nothing in the record beyond his speculation about that. There's nothing in the record that you can point to that Globovor said, tomorrow we're going to want you to do something different. We're going to want you to cross a bridge you've been unwilling to cross before. There's nothing in the record with words to the effect of you immediately stop telling the truth. But given the history of what had happened, I don't think that there's any conclusion one could draw other than that would have been his choice going forward. As they themselves characterized it, he would have had to go back to the preexisting, the 2019 and 2020 practice, which was using the fraudulent disclosures. He was using them and he was told internally, we know this is a problem. We're going to fix it. And he says, okay, let's get it fixed. And then in early 2021, he's told. The problem is I understand you could have a constructive discharge by your resignation to avoid participation in a fraud. You can't point to anything that the employer was requiring him to do that was new or different that would constitute participation in fraud. It's just his speculation. That's where he thought things were headed. Your Honor, I don't believe it's just his speculation. Tell us what in the record makes it anything more than how he felt it was going. Let me address that question by talking about the case law in particular. Now, why don't you point me to the record? Well, the record. I think we understand what the law is. Tell me what's in the record. What the record has is 40 or 50 times he objected or asked questions about when are you going to stop. And he stopped doing things that he refused to participate in and didn't get fired. His questions and objections were never answered except that he received instructions, continue telling this lie and don't tell the truth about the cost of the store. 40 or 50 times he objected or asked questions and they were never answered. And under Engle, the plaintiff resigned because questions about when is this fraud going to stop, she asked. And she never got an answer. She resigned. And that constituted constructive discharge and retaliatory action. Well, so first, Counselor, I do see your time is running. And I want to ask you about the damages or the relief requests that are related to the Deceptive Act, Deceptive Practices Act. But for purposes of the fraud, one of my challenges is trying to figure out what to do with his allegation of fraud. It could be his view that the information that the company was requiring him to provide his customers was inaccurate. But the use of the word fraud is a very strong term of art which suggests criminal activity. Did Mr. Unjuan, and I apologize if I mispronounce his name, did he have to establish definitively that indeed the company was engaging in fraud? Or do we have here really just a different interpretation of criminal law? He would have to establish that they were committing fraud and the district court found that he had sufficiently alleged that. Well, wait a minute. Isn't Florida law divided on that point on whistleblower cases? Aren't there cases from the Florida District Court of Appeal going both ways on that exact legal issue? The question is whether you actually have to prove the case within the case, Your Honor. Whether the thing the employee is complaining about actually has to be illegal or not. Yes, but we accept that if we have to prove it, we can. And the district court found that we had sufficiently alleged that. That wasn't raised below, but the law is not totally clear on that point in Florida. I agree with Your Honor. And if that's the case, then that means your client viewed the activity as unlawful. The company did not. And that disagreement, though, didn't translate into forcing him to adopt their view. They did allow him to provide the information to his clients in the way that he believed was the most transparent or honest. I mean, that is what the record shows, correct? He didn't send out that many proposals. March sent out one that tells the truth. Nothing for several months. He's objecting internally. He's told he has to take a devotion. He resumes telling the truth and that he's told you've got to take this devotion. And he's told to stop complaining and that he's got a bad attitude, which is complaining about the fraud. On the deceptive practices claim, unless I missed it, do you cite to Smith the defendants rely on Smith for the proposition? That the damages your client is requesting, essentially consequential damages from losing his job are not available under this act. I didn't see you addressing Smith at all in your initial or reply brief. Your Honor, we rely on the misclassification cases. And by implication, the misclassification cases say that this would not be consequential damages, that you can recover for lost compensation. I see my time is really brief. I do want to say that there was retaliatory action here because he was told he was going to have to revert to the preexisting practices. And if we're correct, may I continue to finish? Yes. If we're correct that he was in a position where he faced no choice but to participate in the fraud, then under the district court's reasoning, he also faced personal liability. Okay. You've made your point. You've saved three minutes for rebuttal. Let's hear from Mr. Martin. Good morning, Your Honors. Kevin Martin on behalf of the Appellee Work Human. Your Honors, as the case has evolved on appeal, we think that the retaliation claim can be decided on very narrow grounds. The district court found that the actions that Work Human allegedly took against the appellant, Mr. Ungeon, were not retaliatory personnel actions individually, nor did they collectively amount to a constructive discharge. What was the basis for some would say the threat of a demotion? You mean as alleged in the complaint, Your Honor? Yes. What the complaint alleges is that Mr. Ungeon, in March of 2020, sorry, I'm forgetting the year, standing here. But in March, he sent out accurate information. He continued complaining. In June, the company went to him and suggested a transfer to this different executive level position. He calls it a demotion. I think the district court assumed that's true for sake of argument. He then continued sending out what he characterized as more accurate information. A couple months later, the company then said, after he said he did not want a new position, you have to take the position. That's when he got counsel involved and the company retracted that. I'm sorry. He was threatened with a demotion based on the information that he was providing his clients that he believed was more truthful than what the company wanted him to provide. His attorney calls the company and then the demotion or the threat of that is rescinded. So that's the allegation, Your Honor. Now, there are three very important points here. First, the district court did find below that that itself did not amount to a retaliatory personnel action within the meaning of the statute. And that was a correct decision. If you look at this court's cases like Pennington and Fritz v. Pugmire, a withdrawn threat of a demotion or a termination is not a retaliatory personnel action. There was nothing in their opening brief challenging that, nothing in their reply brief challenging that. It might also be that you cobble that together with some of the other actions he complains about, and it amounts to intolerable working conditions and therefore a constructive discharge. The district court found that that's not the case. We did not see an argument against that, although it was sort of vague in their opening brief. It did not seem to us that they were really challenging that in their opening brief. And then they had this concession in their reply brief. This is at page 3. Mr. Ungin does not argue here that the withdrawn threats of demotion and termination, the stern warnings, the fabricated criticism, or the disclosure of his private health information would themselves be grounds for constructive discharge. What he says in his reply brief is that he's only talking about those things because they give some context for his concerns about the future. Because they all relate to the fact that the company was not happy with the information that he was providing his customers. That's the allegation in the complaint, Your Honor. I do want to turn, though, to the statute, which is the third point here. This is a statutory cause of action. This is not some common law cause of action. And under the statute, he has to prove that the statutory elements are satisfied. And under the statute, this is Chapter 448, Section 103. Who can bring a claim for retaliation? Not common law constructive discharge. Statutory retaliation. An employee who has been the object of a retaliatory personnel action in violation of this act may institute a civil action. So as he's posturing the case now in appeal, again, he's not challenged the finding that what happened before was not a retaliatory personnel action. He's admitted in his reply brief that what happened before did not amount to constructive discharge. He's only complaining about the future. His concern that in the future, if he does not in the future go along with the allegedly unlawful acts, there will be retaliation against him in the future. That is simply insufficient under the statute. And that statutory point alone would be grounds enough to affirm the dismissal of his retaliation claim. You can't have a retaliation claim based upon retaliation that hasn't actually happened yet. And that's also consistent with this Court's judgments. We point you to cases like Fitz v. Pugmire, Jones v. Allstate cited in our brief. The District Court cited another case, Beltrami v. Special Counsel. In all of those cases, those may not have been retaliation cases. They tended to be discriminatory termination cases. But in all of them, the Court said you can't jump the gun. If you're concerned that there may be a termination in the future or some kind of act in the future, you need to wait until it actually occurs. We're not going to be encouraging speculative litigation. Even if you think there's a strong possibility that something will happen, you have to wait until it happens. So someone or an employee, essentially what you're saying the case law supports, is that an employee just has to suffer through these threats, this behavior on the part of the employer until the day finally comes. Unless it amounts, in the meantime, to intolerable working conditions. And so that's the Beltrami case that the District Court cited makes this point. It says, even if he were likely to be fired if he attempted to accomplish certain impossible tasks that were set before him, he has not shown that he was being subjected to intolerable conditions in the meantime that would require him to quit immediately. We think that also comes out of the Fitz v. Pugmire case. An employee is being told by his coworkers, you're going to be terminated in the future. And there was some other alleged conduct that this court ultimately concluded did not amount to intolerable working conditions and said the threat of a future termination itself is not an intolerable working condition. Very briefly, the Engel case, which was mentioned, that's an unpublished District Court opinion. Even if it were correctly decided, it's very distinguishable from grounds that we give in our brief. The plaintiff there was, after she complained, subjected to such torment that she, for medical reasons, had to quit the company. And the only question is, when could she come back? And then lastly, on the unfair and deceptive trade practices claim, that was only briefly addressed during Mr. Ungin's argument. There, we think the key points are that under the Florida District Court of Appeals binding decision in Smith, unless you have actual damages, you cannot state a claim. He does not have actual damages within the meaning of the statute. Case after case, District Court cases, deciding employment termination causes of action, have held that there is not a cause of action under FDUPA for termination of employment. Are you aware of any cases decided by the Florida courts, not Federal courts, Florida courts ever allowing a FDUPA claim in an employment context? No, Your Honor. He mentioned the misclassification cases. There's a group of District Court cases. Federal District Court cases. Sorry. Federal District Court cases under FDUPA. Some come out one way. Some come out the other way on whether a supposed independent contractor can bring a FDUPA claim based upon misclassification. Now, we think the case is saying that they cannot or correctly decided. But at the end of the day, you know, those cases can't get him past CMR, this court's decision in CMR construction, the Florida District Court of Appeals decision in Caribbean cruise lines. I mean, he has to show that the action that he's complaining about was directed at a consumer, not directed at him. He's not a consumer. He's an employee. And so the claim needs to fail. Okay. Thank you very much, Mr. Martin. Mr. Black, you've got three minutes. As to whether it was clear to Mr. Ungin that he would have to participate in fraud, the company was not going to let one sales representative deviate from the standard lies it directed all other sales representatives to tell. And though it now says his claims were baseless, it illogically also suggests that he was free to make the claims that he was baselessly complaining about. He was grudgingly allowed at best. He was never free to make those disclosures. And at the end, it was clear that he was not going to be able to make the disclosures. He was going to have to revert to his preexisting job responsibilities, which was the 2019 and 2020 use of the fraudulent proposal language. Counsel, just one more time, I'm asking, where in the record, though, is that established, that he was going to be forced to revert back to using that language? And again, it's the logical conclusion that anyone would have had to reach based on that history leading up to the point. I mean, we can see there was never a word, you use that or else. That kind of language didn't occur. It's not on the record. Nor anything even softer of the variety, next week, we want you to do this. There's nothing like that even. It's close to it, Your Honor. What's the close? Where in the record is the closest thing? You've got this terrible attitude because you keep telling us to tell the truth. Where is that? That's in the complaint, Your Honor. You've got a bad attitude. Okay, that's it. That's what you got. They're essentially arguing constructive discharge without retaliation. The Ingle case. Just a second. I wanted to stick with this before you go on. You've gone further, though. You've said, and you said at the end of your last presentation before you ran out of time, could have exposed him to personal liability. That sounds pretty egregious. What would his personal liability could have been here? He was directly telling people things that weren't true. He could have been using these proposals. And some of the customers would have sued him personally for fraud? Under the nationwide case, yes, Your Honor. And the reason for rejecting that claim, the district court said, well, you were free to tell the truth. If you find that he wasn't really free to tell the truth going forward, then by district court's reasoning, he would have been subjected to personal liability. In the Ingle case, she did suffer some consequences after complaining, but she got over that. It's when she wanted to come back to work that they wouldn't answer her questions. One final comment. There's been a lot of discussion of interpretation of the facts here. This is a motion to dismiss. Yep. We understand it. We understand the standard. Thank you, Mr. Black.